**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GRAND STAIRCASE ESCALANTE PARTNERS<br>on behalf of itself and its members<br>310 South 100 E., P.O. Box 53<br>Kanab, UT 84741<br><br>SOCIETY OF VERTEBRATE PALEONTOLOGY<br>on behalf of itself and its members<br>9650 Rockville Pike<br>Bethesda, MD 20814<br><br>and<br><br>CONSERVATION LANDS FOUNDATION<br>835 E. 2nd Ave. #314<br>Durango, CO 81301<br><br>    *Plaintiffs*,<br><br>      v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States<br>1600 Pennsylvania Ave. NW<br>Washington, DC 20006<br><br>and<br><br>RYAN ZINKE, in his official capacity as Secretary<br>of the Department of the Interior<br>1849 C St., NW<br>Washington, DC 20240<br><br>    *Defendants*. | <u>Civil Action No. 17-2591</u> |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Grand Staircase Escalante Partners, Society of Vertebrate Paleontology, and Conservation Lands Foundation (collectively, "Plaintiffs"), by and through their undersigned counsel, for their complaint for declaratory and injunctive relief against Defendants Donald J. Trump and Ryan Zinke (collectively, "Defendants"), state as follows:

## NATURE OF THE ACTION

1.      This lawsuit seeks to overturn President Donald Trump's unconstitutional, unlawful, and unauthorized action vastly shrinking the boundaries of  Grand Staircase-Escalante National Monument ("Grand Staircase," or "the Monument") and eliminating protections for the sensitive resources located there.

2.      Defendant Trump's action is an unconstitutional and *ultra vires* exercise of a power committed to Congress and not delegated to the Executive Branch.  Under the Antiquities Act of 1906, ch. 3060, §§ 1–4, 34 Stat. 225, 225 (1906) (codified as amended at 54 U.S.C. §§ 320301–320303) (the "Act"), a President may "declare" historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest situated on land owned or controlled by the Federal Government to be national monuments," and "reserve parcels of land as a part of the national monuments." *Id.*  In passing this Act, Congress granted the President broad authority to protect lands necessary for preserving sensitive resources.  Congress did not delegate any complementary authority to rescind or reduce monument designations or protections.  That power resides solely with Congress under Article IV of the Constitution.

3.      The President's attempt to eliminate Grand Staircase's protections intrudes on Congressionally reserved powers under the Constitution in violation of bedrock separation of powers principles, ignores explicit post-proclamation Congressional enactments that assert Congress' sole prerogative over the Monument's boundaries and attendant protections, and is an

*ultra vires* act of unbounded discretion, contrary to the statute and the record.  This action puts at risk a key part of our nation's natural legacy.

4.     Grand Staircase is one "of the most renowned conservation land units in the United States."  *See* Utah Schools and Lands Exchange Act, Pub. L. No. 105-335, § 2(14), 112 Stat. 3139, 3141 (1998).  It is comprised of an area in southern Utah that was granted permanent protection as a national monument on September 18, 1996, pursuant to the President's authority under the Antiquities Act.

5.     The creation of Grand Staircase was wholly consistent with the long-standing and established interpretation of the Antiquities Act and Presidential practices thereunder.  Since 1906, Presidents of both parties have used the Act to preserve over 150 areas, including expansive geographic areas and natural—as well as man-made—objects.  President Theodore Roosevelt used the Act to protect, among other areas, the Grand Canyon and, in *Cameron v. United States*, 252 U.S. 450 (1920), the Supreme Court upheld this designation precisely because of the Grand Canyon's vast size as a natural geological feature.

6.     At its creation, Grand Staircase totaled approximately 1.7 million acres, and was established to protect the thousands of sensitive scientific, historic, prehistoric, archaeological, paleontological, cultural, and natural resources located across its landscape.  *See* Proclamation No. 6920, 110 Stat. 4561, 4564 (1996) ("1996 Proclamation").  The Monument encompasses one of the most fossil-rich areas in the world, and study of the Monument has resulted in groundbreaking discoveries.  The ability to find and study hundreds of exquisitely preserved extinct vertebrate, invertebrate, and plant species has, in just the past two decades, added to human understanding of Earth's history.  The Monument is a particularly important source for fossils of the Late Cretaceous Era, which represents the end of the Age of Dinosaurs.  It is

similarly important for the study of the Triassic period because it contains fossil records

documenting the recovery from Earth's largest extinction event at the end of the preceding

Permian period, and for the study of the behaviors of ancient animals from the Jurassic period.

As a result, the Monument serves as the epicenter for significant research activities by numerous

esteemed academic institutions and museums.  Likewise, the Monument abounds in

archaeological resources left behind by the Fremont and Ancestral Puebloan cultures that

occupied the region.  Only a small portion of the paleontological and archaeological records have

thus far been surveyed.  In addition, the Monument is in one of the most remote areas in the

contiguous United States and includes unique ecosystems and irreplaceable geological

formations.

      7.     The Monument's original boundaries are the "smallest area compatible with

proper care and management" of the protected resources.  54 U.S.C. § 32301(b).  Congress later

expanded the Monument to approximately 1.9 million acres.  *See* Utah Schools and Lands

Exchange Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998); Act of November 6, 1998,

Pub. L. No. 105-355, §§ 201–202, 112 Stat. 3247, 3252–53.

      8.     The Bureau of Land Management ("BLM"), an agency within the Department of

the Interior, has until now managed the public lands within Grand Staircase according to two

basic precepts: (i) the Monument must be protected in its primitive frontier state in order to

safeguard the sensitive scientific and historic resources; and (ii) the Monument should continue

to provide unparalleled opportunities for the scientific study of those resources.  *See* Bureau of

Land Mgmt., U.S. Dep't of the Interior, Grand Staircase-Escalante National Monument

Approved Management Plan – Record of Decision iv, 5 (November 1999),

https://ia600202.us.archive.org/11/items/grandstaircasees00unit/grandstaircasees00unit.pdf (the

"Grand Staircase Management Plan") (last visited Dec. 3, 2017).  This approach, embodied in

the Grand Staircase Management Plan, has been essential for preserving Grand Staircase's

critical resources.

9.      In 2004, the U.S. District Court for the District of Utah confirmed that the

Presidential proclamation creating Grand Staircase satisfied the requirements for the creation of

national monuments under the Antiquities Act, including that the objects identified were

appropriate for protection under the Act, and that the area delineated was the "smallest area

compatible" with protecting these sensitive resources.  *See Utah Ass'n of Ctys v. Bush*, 316 F.

Supp. 2d 1172 (D. Utah 2004).

10.     Neither the Constitution, the Antiquities Act, nor any other provision of law

authorize the President to eliminate national monument protections.

11.     On December 4, 2017, President Donald J. Trump issued the "Presidential

Proclamation Modifying the Grand Staircase-Escalante National Monument" (the "December

Proclamation") that purported to rely on the Antiquities Act to eliminate significant portions of

Grand Staircase's permanent protections.  The December Proclamation asserts that the

Monument is "modified and reduced" and replaces it with three substantially diminished units:

the Grand Staircase Unit; the Kaiparowits Unit; and the Escalante Canyons Unit.  The total area

of the new monument is 1,003,863 acres, which excludes approximately half the area of Grand

Staircase-Escalante National Monument.  This is an unprecedented usurpation of legislative

authority.  The Antiquities Act does not countenance the President vastly reducing a national

monument's boundaries.

12.     The December Proclamation also attempts to force management changes over the

remaining area of the Monument.  On February 2, 2018, the Proclamation would throw open the

excluded areas of the Monument to irreparable extractive activities: "the public lands excluded from the monument reservation shall be open to: (1) entry, location, selection, sale or other disposition under the public land laws; (2) disposition under all laws relating to mineral and geothermal leasing; and; (3) location, entry, and patent under the mining laws."  The Antiquities Act does not authorize the President to open protected resources up to such destructive activities.

13.     Additionally, the December Proclamation purports to force management changes over the remaining area of the Monument by amending the 1996 Proclamation.  The December Proclamation "clarifi[es]" that "the Secretary may allow motorized and non-mechanized vehicle use on roads and trails existing immediately before the issuance of [the 1996 Proclamation and maintain roads and trails for such use."  Additionally, the December Proclamation amends the 1996 Proclamation to allow the Secretary of the Interior to "authorize ecological restoration and active vegetation management activities."  Neither the Antiquities Act nor any other statute authorizes the President to forcibly remove land protections by fiat and subvert the Congressionally mandated process that the Executive Branch must comply with to alter land management regimes.

14.     Defendant Trump's action excludes and fractures key objects specifically identified for protection by President Clinton in the 1996 Proclamation and fundamentally compromises the remote, frontier quality that the original Proclamation identified as necessary for preservation of the scientific and historic objects in Grand Staircase-Escalante National Monument.

15.     As a result of these actions, Monument lands and resources both inside and outside of the diminished boundaries are no longer being afforded the protections national monuments are due.  Outside of the boundaries, the President's action eliminates prohibitions

against extractive activity (such as coal mining and oil and gas drilling), undermines protections essential to preventing the degradation of sensitive resources (such as through untrammeled access, vandalism and looting), and undercuts the numerous programs, initiatives, business ventures, and projects that rely on the status and protections of the Monument.  Inside the boundaries, the December Proclamation will subject the resources and the lands to the destructive effects of "motorized and non-mechanized vehicle use" and intensive vegetation management.  More broadly, the President's action will significantly harm the remote and protected qualities of the Monument that preserve these sensitive resources and create the scientific opportunities for which the Monument was created and is best known.  This diminishment of protections causes direct and indirect harm to the organizations, businesses, and individuals who value the Monument and depend on its status and the protections such designation affords for advancing scientific research, their livelihoods, and their enjoyment and spiritual fulfillment.  This action harms the American people by undermining the protection of key treasured portions of our nation's public lands legacy.

16.     Plaintiffs ask this Court to declare the December Proclamation void and to enjoin Defendants from implementing it.  The grounds for this request are (a) that the President, in violation of bedrock separation of powers principles, has illegally exercised authority that the Property Clause of the Constitution, U.S. Const. art. IV, § 3, cl. 2, explicitly vests solely in Congress, which authority has not explicitly or implicitly been delegated to the President; (b) that the President's actions are ultra vires by taking an action that is not authorized by the Antiquities Act either explicitly or implicitly; (c) that the President has improperly attempted to override Congressional legislation by eliminating the protections over portions of a monument over which Congress has directly legislated multiple times, thereby asserting its sole prerogative

over the status of this area; and (d) that the President has no authority to circumvent the superstructure created by federal lands management and environmental laws enacted by Congress, and the Secretary of the Interior remains obligated to govern Grand Staircase according to the requirements of the Grand Staircase Management Plan, the Federal Land Management and Policy Act, and the National Environmental Policy Act, *inter alia*.  Moreover, even if this Court were for some reason to find that the President has some authority to eliminate monument protections (which he does not), there is no factual or legal basis for undoing a prior President's actions and eliminating Grand Staircase's protections given the clear record supporting the original Proclamation and the current Monument delineation.

## PARTIES

### *Plaintiffs*

### Grand Staircase Escalante Partners

17.    Plaintiff Grand Staircase Escalante Partners ("Partners") is a non-profit corporation exempt from taxation under 26 U.S.C. § 501(c)(3), founded in 2004 and organized under the laws of the state of Utah.  Partners's membership is comprised of 420 members as of December 1, 2017, and its governing board is comprised of 11 members.  Partners currently employs 12 paid staff members.

18.    Partners is dedicated to supporting, protecting, maintaining, and advancing Grand Staircase.  As indicated in its bylaws, Partners's primary purpose is to assist Grand Staircase in its mission as established in Presidential Proclamation 6920 of September 18, 1996, and the Monument Management Plan approved November 15, 1999.

19.    Partners pursues this overarching goal in numerous ways.  In particular, it supports the Monument's activities and programs in upholding the Monument's scientific, recreational, scenic, natural, and cultural objects and values by:

a.  carrying out extensive student education programs, including a
    curriculum-based education program that helps students, teachers, and
    people of all ages explore Grand Staircase and the public lands and rural
    communities of southern Utah and northern Arizona;

b.  managing lab work for the Monument's world-class paleontology
    program, cataloging the paleontology collections, training and
    coordinating volunteers for field work, and educating the public regarding
    this program;

c.  designing and coordinating a Site Steward Program to inspect
    archaeological sites for signs of damage caused by natural erosion, animal
    activity, looting, or vandalism;

d.  supporting the BLM in restoration of damaged sites; and

e.  being a central participant in the largest ecosystem restoration program in
    the region—and the largest riparian restoration project in BLM history—
    the Escalante River Watershed Project, which also helps to secure
    extensive outside financial resources for the operation and management of
    the Monument.

20.     Partners also pursues this goal by actively promoting the vibrant local
communities surrounding the Monument.  Partners collaborates with local businesses in support
of the Monument's activities and programs, contributes to community economic development,
and participates in numerous community events.

21.     Since its founding, Partners has been inextricably intertwined with the Monument
and its programmatic activity has grown as the organization has grown.  Incorporation was a

result of a meeting between citizens in Kanab who supported the establishment of Grand

Staircase and the Monument Manager who asked these individuals to form a friends group.  In

the years since, Partners has steadily grown its initiatives—often at BLM's request—to promote

and safeguard the Monument.  These have grown from assisting BLM with "Walks and Talks"—

an educational program for visitors and local residents—into a broad panoply of programs.  By

2012, Partners had developed a full suite of educational programs, set up robust paleontological

and archaeological programs, and engaged in extensive restoration efforts.  All of these programs

have expanded since then.  For example, in August 2016, Partners established a Master

Naturalist Program, which recruited and trained community members to become Utah State

University-certified Master Naturalists.  As these responsibilities have grown, Partners has hired

more full-time staff, including an Executive Director in 2010.  Since its inception, Partners has

worked tirelessly to advance the Monument's protection and secure the resources necessary to

accomplish this work.

22.     Partners's membership is composed of: numerous scientists including geologists,

paleontologists, archaeologists, ecologists, and biologists; business leaders from gateway towns;

community leaders; recreationalists; and other individuals who seek the ongoing preservation of

Grand Staircase.  These members are drawn from 37 states, Washington D.C., Switzerland,

Canada, and the United Kingdom.

23.     Partners supports Grand Staircase in all arenas and works to enhance public

understanding of, respect for, and enjoyment of the Monument among the general public.

Partners submitted comments to the Secretary of the Interior as part of the 2017 monument

review process that led to the President's challenged action.  *See* Comments of Grand Staircase

Escalante Partners, DOI-2017-0002-574082 (filed July 7, 2017),

https://www.regulations.gov/document?D=DOI-2017-0002-574082 (follow Attachment "PDF"

hyperlink at bottom of page) (last visited Dec. 2, 2017).  Additionally, during the 2017

monument review process, Partners organized a community welcome rally for Defendant Zinke

in Kanab, Utah, and sponsored an educational event in Escalante, Utah, to raise awareness and

ensure that the community understood the nature of comments being called for by the

Department of the Interior.

24.     Members of Partners visit or otherwise actively use and enjoy Grand Staircase's

lands and resources for recreation, aesthetic and spiritual enjoyment, wildlife viewing,

photography, and artistic inspiration.  Members rely on Grand Staircase's designation as a

national monument in their professional scientific and research work and their businesses,

livelihoods, and educational endeavors and have continuing plans to do so.  The members' use

and enjoyment of these areas are inextricably intertwined with the Monument's sensitive

resources, and are affected by the condition of the area and the status of the Monument's

resource protections.

25.     Partners and its members derive value from the national monument designation

and the protections it affords.  They rely on Grand Staircase's national monument designation to

secure funding for their businesses, increase the value of their investments, attract customers, and

increase their revenue.  The December Proclamation eliminates significant protections at Grand

Staircase.  Upon information and belief, this elimination will harm the value of members'

investments and adversely impact their revenue streams.  Moreover, upon information and belief,

visitors will see this elimination of Grand Staircase's protections as damaging the area's scenic

and recreational status, and this change will directly reduce the number of visitors and lead to a

concomitant reduction in revenue.  Additionally, many members rely on the Monument's scale

in their marketing and other materials.  As a result of the elimination of Grand Staircase's protections, Partners and its members will be harmed and forced to spend substantial time and resources revising marketing information, business plans, and other material.

26.     Further, the extensive elimination of Grand Staircase's protections will immediately and irreparably harm Partners because it undermines the multitude of programs that Partners offers and participates in.  These include the Escalante River Watershed Partnership, the Archaeological Site Steward Program, and the Paleontological Science Laboratory.  Partners has also led a Master Naturalist Training in collaboration with Utah State University using Grand Staircase as the classroom.  Partners participates in numerous community events, including: the Boulder Heritage Festival; the Escalante Canyon Arts Festival; the Bryce Canyon Geology Festival; the Big Water Dino Festival; Earth Day events at the Kanab Elementary School; river restoration presentations at Escalante High School; the restoration of the Historic Rock Springs Corral and Henrieville Creek; Public Lands Day activities; the Amazing EarthFest; the Kanab Balloon Festival; and the newly christened Grand Staircase-Escalante Community Lecture Series—each of which depends to some extent on the area's designation as a national monument for drawing participants and creating programming content.  Further, Partners was heavily involved in promoting and running programs related to the 2016 20th anniversary of Grand Staircase, including printing a compendium of research summaries entitled *Science Summary 2006-2016: Learning from the Land*.  Partners relies on Grand Staircase's national monument designation—and the attendant protections—to present this programmatic activity to the public, attract public support for it, and generate the public and foundation funding required to undertake these activities.  To a large degree, Partners's philanthropic donations are generated to support the "Grand Staircase-Escalante National Monument" as a unique and special place, rich in

scientific and natural resources and opportunities for personal enrichment, and with the understanding that it would be protected for all time.  Any action perceived by the public as a demotion of the significance of the Monument will, accordingly, harm this fundraising.  On information and belief, the extensive elimination of Grand Staircase's protections is such a demotion and will lead to such harm.

27.     Additionally, the Defendants' action seeks to undo the 1996 Proclamation's prohibition for extensive areas on "entry, location, sale, leasing, [and] other disposition under the public land laws" of Grand Staircase's lands, as well as the requirement that land be managed in a way that gives the highest priority to preservation of the protected resources.  *See* 1996 Proclamation, 110 Stat. 4561, 4564.  This removal threatens current and future uses of the Monument by Partners's members.  For example, lands previously protected by the Presidential Proclamation establishing Grand Staircase will be subject to the broader public land management laws, including the General Mining Law of 1872, 30 U.S.C. §§ 21 *et seq*.  That law allows prospectors, without prior permit or authorization from any government agency, to enter federal land in search of mineral deposits.  Moreover, for resources such as coal, oil, and natural gas, removal of monument protections allows the Department of the Interior to begin the process of leasing parcels of land for extraction.

28.     The current Administration has pursued increased extractive activity on federal lands.  In particular, the Administration has repeatedly expressed support for greater coal extraction.  On information and belief, given this desire and the mineral resources in Grand Staircase, the elimination of Grand Staircase's protections authorizes an upsurge in activity that is inconsistent with preservation of sensitive sites.  There is thus an immediate risk of irreparable harm to sensitive resources once this process commences —including to  fossils and

archaeological artifacts—that are of significance to Partners and its members professionally and personally.

29.     Upon information and belief, the elimination of Grand Staircase's protections will speed degradation of sensitive resources currently protected by the Monument, creating the risk of rock art vandalism, artifact removal, illegal digging, ATV use across sensitive areas, and artifact and fossil theft.  The national monument designation is critical for keeping such destructive activities in check.  Its removal will substantially and immediately weaken the protections preventing their occurrence.

Society of Vertebrate Paleontology

30.     Plaintiff Society of Vertebrate Paleontology (the "Society") is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws of California, and headquartered in Bethesda, Maryland.  The Society has approximately 2,200 members as of December 2017.  The Society's membership is composed of those interested in vertebrate paleontology and includes both professional and avocational paleontologists.

31.     As set out in the Society's constitution, the Society's purpose is to advance the science of vertebrate paleontology and facilitate the cooperation of persons concerned with the history, evolution, ecology, comparative anatomy, and taxonomy of vertebrate animals, as well as the field occurrence, collection, and study of fossil vertebrates and the stratigraphy of the beds in which they are found.  The Society also supports the discovery, conservation, and protection of vertebrate fossils and fossil sites.  The Society works toward fostering the scientific, educational, and personal understanding of vertebrate fossils and fossil sites by paleontologists and the general public.

32.     To advance vertebrate paleontology, the Society: organizes an annual international scientific conference for its members; periodically sponsors symposia at other scientific conferences; distributes merit-based grants, fellowships, and awards for paleontological research, artwork, and educational outreach; establishes professional standards for the collection and curation of fossils, for management of paleontological data, and for the documentation of paleontological research; works with policymakers, lawmakers, and regulators in the United States and around the world to establish regulatory and legal protection of scientifically valuable fossil resources; publishes the Journal of Vertebrate Paleontology; and raises funds to support the aforementioned activities.

33.     The Society and its members have a scientific interest in Grand Staircase and actively work to enhance the scientific value and public appreciation of the paleontological resources at the Monument.  Approximately 10 percent of the Society's members have done some field research in the Monument.  Because of the Monument's exceptional fossil resources, the Society's members have been active in documenting those resources at the Monument since 1996, and recently submitted comments to the Secretary of the Interior as part of the 2017 monuments review process.  *See* Comments of the Society of Vertebrate Paleontology, DOI-2017-0002-100908 (filed May 25, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-100908 (follow Attachment "PDF" hyperlink at bottom of page) (last visited Dec. 2, 2017). Fossils from the Monument were showcased at the Society's 2016 annual meeting in Salt Lake City and a three-day field trip to study paleontological sites on the Kaiparowits Plateau was organized for Society members in collaboration with Monument staff.

34.     Members of the Society visit and regularly conduct paleontological field research within Grand Staircase and rely on its designation to protect the paleontological and geological

resources upon which their professional scientific and research work, educational endeavors, and careers depend. Furthermore, the Monument is chosen as a place for research because of its scientifically important vertebrate fossils and because national monument status provides for the permanent protection of the field sites, which in turn guarantees future access for purposes of verifying previous data and conclusions. Because the exceptional paleontological resources were objects specifically protected under the 1996 Proclamation, preservation of those resources is prioritized over many other potentially conflicting uses of the land. The special status of paleontological resources also justifies employing professional paleontological staff at the Monument who coordinate activities among research groups and organize protection efforts. Finally, national monument status ensures broad access by the scientific community and the interested public to the fossils and associated data. All of these features enhance the quality of research by Society members, contribute to the success of competitive research grant applications, and ensure that the scientific process of research, conclusions, and verification can be realized. Society members' current and future use and enjoyment of these areas are therefore integrally intertwined with the Monument's sensitive resources, its fossil resources in particular, and are affected by the condition of the areas and the delineation and effectiveness of its resource protections. Furthermore, the Society's broader educational mission to inculcate an appreciation for paleontology among amateur scientists and the general public will be harmed as a result of these losses.

35.     Serious vertebrate paleontological research on the lands that now make up the Monument began with the work of Society members Jeff Eaton and Rich Ciffelli, who studied the Late Cretaceous microvertebrate faunas of the Kaiparowits Plateau starting in the early 1980s. The fossils they and their colleagues collected are curated at the University of Colorado,

Oklahoma University, the Museum of Northern Arizona, and the Utah Museum of Natural History (UMNH), where they continued to be studied by Society members and, more broadly, by the international scientific community and interested members of the public.  The next phase of research after the Monument was established was surveying the entire property for vertebrate paleontological resources.  Member Scott Sampson from the UMNH has conducted field research since around 2001 and member Joe Sertich from the Denver Museum has conducted field research for almost ten years.  Other members, such as Jacques Gautier and Marilyn Fox of Yale University, have also conducted research in the Triassic units, which led to the discovery of the most complete *Poposaurus* skeleton known to date (material that sheds light on the origin of dinosaurs).  More than 100 members have participated in long-term research at the Monument and at least 100 others have visited for short-term scientific purposes such as field trips or site visits

36.     Paleontological research at the Monument is ongoing and there is abundant evidence to indicate that it will continue to yield scientifically important results well into the future.  New discoveries are still being made at rates that indicate that the full inventory of the fossil taxa preserved at the Monument has not yet been recovered.  In scientific terms, this is referred to as the "steep side of the collection curve."  A "collection curve" is a statistical way of looking at the number of taxa sampled relative to the amount of effort expended to recover them in the field.  When an area is first studied, the number of new discoveries is large relative to the amount of time expended but, as research continues new discoveries become more rare.  At Grand Staircase researchers are still in the first phase of this "curve," which means that important scientific work should continue for decades or centuries to come with the protective regime that the Monument currently affords.

37.     Continued status as a national monument is also critical to the Society because new methods and technologies allow new scientific questions to be asked of old, well-studied sites.  Monument status affords protections that preserve sensitive sites over long periods of time, and the policy governing scientific work at the Monument has played an essential role in advancing research.  For example, Daigo Yamamura of the University of Arkansas recently studied the paleoenvironment and paleoclimate of the Late Cretaceous using new stable isotope analytic techniques.  His research was based on earlier collections housed at the UMNH, which he then verified by sampling sediments from the original sites at the Monument.  He was able to carry out this research because of the precise locality information available for the previously collected specimens, which is mandated by the Monument's scientific work policy, and because he was able to revisit the same sites, which remained intact.  Similarly, member Eric Roberts has been able to develop a refined chronology for the geological units at the Monument by applying new uranium-lead dating techniques at the sites where the original stratigraphic framework was developed.  Elimination of extensive areas of Grand Staircase's protections will irreparably harm the ability of Society members to perform paleontological research in the area.

<u>Conservation Lands Foundation</u>

38.     Plaintiff Conservation Lands Foundation (the "Foundation") is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws of Delaware, and headquartered in Durango, Colorado.  The Foundation maintains regional offices in the District of Columbia and five states.

39.     The Foundation's organizational purpose is to promote environmental conservancy through assisting the National Landscape Conservation System ("NLCS," also known as the "National Conservation Lands") and the preservation of open space and

wilderness.  The National Conservation Lands are part of a Federal Government land designation

system that encompasses 35 million acres and 2,400 river miles of National Monuments,

National Conservation Areas, Wilderness and Wilderness Study Areas, Wild and Scenic Rivers,

National Scenic and Historic Trails, and other special designations.  Grand Staircase is the

largest and among the best-known units in the National Conservation Lands.  The Foundation is

the only non-profit in the country specifically dedicated to establishing and safeguarding the

National Conservation Lands.  To fulfill its organizational purpose, the Foundation works to

protect, restore, and expand the National Conservation Lands through education, advocacy, and

partnership.

40.    The Foundation created the Friends Grassroots Network, which is comprised of

over 60 organizations located in 12 states, including Partners, to support the National

Conservation Lands.  Member organizations organize and conduct a wide range of conservation-

related activities, including clean-up projects, trail maintenance and rebuilding, riverbank and

stream restoration, removal of invasive species, closure of illegal roads, water quality

monitoring, enhancement of wildlife habitat, and improvement of recreational access.  In 2015

alone, members of the Friends Grassroots Network dedicated over 53,000 hours to these types of

conservation activities.  The Foundation and the Friends Grassroots Network also cooperate in

public advocacy and education efforts to promote conservation of public lands.

41.    The Foundation was actively involved in Secretary Zinke's national monument

review and submitted comments specifically addressing Grand Staircase as part of the 2017

monuments review process.  *See* Comments of the Conservation Lands Foundation and the

Wilderness Society, DOI-2017-0002-112216 (filed May 26, 2017),

https://www.regulations.gov/document?D=DOI-2017-0002-112216 (follow Attachment "PDF"

hyperlink at bottom of page) (last visited Dec. 2, 2017).  The comments expressed strong support

for Grand Staircase and its boundaries as they existed prior to President Trump's action.  The

Foundation engaged in these processes in conjunction with other organizations and on its own

behalf to further the Foundation's mission and to protect the interests of the organization, its

supporters, and its Friends Grassroots Network groups and their members.

42.    The Foundation has also undertaken significant independent advocacy and public

engagement efforts to protect Grand Staircase, including before, during, and after the 2017

monument review process.  Since 2010, the Foundation has met annually with Monument and

Assistant Monument Managers in Escalante, Utah, and BLM staff in Washington, D.C., to

provide input on management issues related to grazing, maintenance of roads, and collaboration

with Partners.  For example, in 2012, the Foundation met with BLM staff and sent a formal letter

to express opposition to a proposal from Garfield County to pave Hole-in-the-Rock Road, a

decision that would have violated the existing land use plan for the Monument.  In 2013, the

Foundation sent a letter to then-BLM Director Neil Kornze that highlighted the effects the

government shutdown had on the National Conservation Lands.  In 2013, the Foundation worked

closely with the BLM and Partners on the Utah State Plan for the National Conservation Lands,

which included an official comment letter that outlined suggestions for how to increase

conservation protections for Grand Staircase-Escalante National Monument.  On May 21, 2015,

the Foundation submitted a letter to the Senate Subcommittee on Public Lands, Forests and

Mining, expressing concern over a proposed bill that would have undermined conservation

protections in Grand Staircase.  On February 9, 2016, Foundation staff traveled to Washington,

D.C., to meet with BLM's National Partnerships Program Lead Trevor Needham to request that

BLM strengthen a public-private partnership with Partners so that Partners could continue

providing volunteer education and stewardship services at the Monument.  In February 2017, Foundation staff and board members met with Acting BLM Director Mike Nedd to express support for continuing the Escalante River restoration work at the Monument.

43.     The Foundation plays a large role in preserving the Grand Staircase's values and resources; any elimination of the Monument's protections causes the Foundation direct, immediate, and irreparable injury.  Damage to such a prominent unit poses a grave threat to the Foundation's programs aimed at maintaining the National Conservation Lands.

*Defendants*

44.     Defendant Donald J. Trump is the President of the United States, and in his official capacity he signed the December Proclamation eliminating Grand Staircase-Escalante National Monument's protections.  President Trump's official residence and his principal offices are in Washington, D.C.  Plaintiffs sue President Trump in his official capacity.

45.     Defendant Ryan Zinke is the Secretary of the Department of the Interior.  In his official capacity, he is responsible for implementing the provisions and requirements of applicable federal laws on federal lands, including the responsibility to protect Grand Staircase, and is responsible for implementing the December Proclamation that eliminated Grand Staircase's protections.  Secretary Zinke conducted the review and submitted recommendations to the President upon which the December Proclamation is based.  Secretary Zinke's principal office is in Washington, D.C.  Plaintiffs sue Secretary Zinke in his official capacity.

## JURISDICTION AND VENUE

46.     Plaintiffs' claims arise under the Property Clause of the Constitution, U.S. Const. art. IV, § 3, cl. 2., the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and the Antiquities Act, 54 U.S.C. §§ 320301–320303, and concern the lack of Presidential authority to eliminate or

curtail a national monument's protections.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

47.     Venue in this District is proper under 28 U.S.C. § 1391(e)(1) because this is a civil action brought against officers of the United States acting in their official capacities and under color of legal authority, and this is the judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred."

48.     Because Plaintiffs allege that Defendants acted in excess of their statutory and constitutional authority, and seek only declaratory and injunctive relief against Defendants in their official capacity, the sovereign immunity of the United States is not implicated.  *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963); 5 U.S.C. § 706(2).

49.     The declaratory, injunctive, and other relief requested is authorized by 28 U.S.C. §§ 1361, 1651, 2201–2202, and this Court's general equitable powers.

## LEGAL BACKGROUND

50.     The Property Clause of the U.S. Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Const. art. IV, § 3, cl. 2.  The President has only such authority over federal property as Congress has expressly delegated.

51.     Congress delegated to the President certain limited power under the Property Clause when it enacted the Antiquities Act on June 8, 1906.  *See* 54 U.S.C. § 320301(a), (b). The Act authorizes the President of the United States to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," and to "reserve parcels of land as a part of the national monuments" that comprise

the "smallest area compatible with the proper care and management of the objects to be protected." *Id*. § 320301(a), (b).  Neither the Act nor any other statute contains language authorizing the reduction or removal of national monuments.  *See id.*

52.     Congress passed the Antiquities Act to empower the President to permanently protect sensitive resources and lands absent later Congressional changes to those areas.

53.     The Antiquities Act provides no authority whatsoever for a President to eliminate extensive protections at Grand Staircase.  No authority exists for a President to eliminate national monument protections in part or in full.  Those authorities rest solely with Congress.

54.     Since its passage in 1906, the Antiquities Act has been used over 150 times to create national monuments.

55.     In 1976, Congress passed the Federal Land Policy and Management Act, 42 U.S.C. §§ 1701 *et seq.* ("FLPMA"), further specifying the restrictions on, and directives for the Executive Branch's management of Federal lands, including the designation and management of national monuments.  In passing FLPMA, Congress preserved the President's unique but limited authorities under the Antiquities Act.  Additionally, the management regime specified by FLPMA incorporates procedural protections under other statutes, including the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, and the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*), where agency-level management actions are authorized.

56.     Under FLPMA, BLM is required to manage federal public lands "under principles of multiple use" and "in accordance with [a] land use plan," "except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law."  43 U.S.C. § 1732(a).  The Presidential proclamation

creating Grand Staircase-Escalante National Monument constitutes such superseding provisions of law dedicating the Monument to specific protective uses. *See generally* 1996 Proclamation.

57.     Subsequent to the 1996 Proclamation, Congress passed multiple laws impacting the area, boundaries, and status of Grand Staircase. *See infra*, ¶¶ 64–68.

## FACTUAL ALLEGATIONS

*The Establishment of Grand Staircase-Escalante National Monument in 1996*

58.     Prior to Grand Staircase's creation, the area covered by the Monument was well known as a rich source of important archaeological and paleontological resources. For example:

    a.  Paleontological studies have been pursued in the Monument area since the 1800s. *See* David D. Gillette & Martha C. Hayden, Utah Geological Survey, *A Preliminary Inventory of Paleontological Resources within the Grand Staircase-Escalante National Monument, Utah* 7, Utah Dep't of Nat. Res. (1997), http://www.files.geology.utah.gov/online/c/c-96.pdf (last visited Dec. 3, 2017).

    b.  Archaeology performed within the Monument boundaries in the early 20th Century was critical in advancing scientific understanding of cultures in the region. *See* David B. Madsen, Utah Geological Survey, *A Preliminary Assessment of Archaeological Resources within the Grand Staircase-Escalante National Monument, Utah* 6, Utah Dep't of Nat. Res. (1997), https://ugspub.nr.utah.gov/publications/circular/C-95.pdf (last visited Dec. 3, 2017).

59.     Permanently safeguarding this trove of sensitive resources, Grand Staircase was created by Presidential Proclamation on September 18, 1996. *See* 1996 Proclamation, 110 Stat.

at 4564.  The 1996 Proclamation specifically identified numerous sensitive historic, prehistoric, and scientific resources throughout the Monument as the basis for protecting the area.  *See generally* 1996 Proclamation.

60.     The lands of the Monument were "set apart and reserved . . . for the purpose of protecting the objects identified" in the 1996 Proclamation.  *Id.* at 4563–64.  In total, the 1996 Proclamation reserved 1.7 million acres for the protection of the plethora of sensitive resources that span the entirety of the Monument *See id.* at 4564.  This is the "smallest area compatible with proper care and management," 54 U.S.C. § 32301(b), of the protected resources.

61.     As discussed at ¶¶ 64–65, *infra*, Congress later ratified through legislation an agreement between the Secretary of the Interior and the Governor of Utah to exchange federal land outside the Monument for state-owned inholdings within Grand Staircase.  This, combined with additional Congressional boundary adjustments, expanded the Monument's acreage to nearly 1.9 million acres.  *See* Bureau of Land Mgmt., U.S. Dep't of the Interior, Grand Staircase-Escalante National Monument Manager's Annual Report FY 2014 at 2 (2015).

62.     The 1996 Proclamation provides that "[a]ll Federal lands and interests in lands within the boundaries of this monument are hereby appropriated and withdrawn from entry, location, selection, sale, leasing, or other disposition under the public land laws . . . ." 1996 Proclamation, 110 Stat. at 4564.  As a result, all new mining claims and oil and gas leasing activities were prohibited within the Monument area as of September 18, 1996.

63.     The 1996 Proclamation also allowed for the continuation of grazing in an effort to ensure that traditional land uses remain largely undisturbed.  Over 96 percent of the Monument remains open for grazing, and only 17 allotments are partially or entirely unavailable.  In 1996, there were 77,400 Animal Unit Months ("AUMs") and today the number of permitted AUMs is

76,957.  Some grazing permits were relinquished voluntarily due to drought or, in some areas

along the Escalante River, voluntarily sold to a third-party at a premium to protect the fragile

riparian zone.

*Post-Proclamation Congressional Activity Related to Grand Staircase*

64.     In 1998, two years after the Monument's establishment, Congress ratified by law

an agreement between the State of Utah and the Secretary of the Interior involving the exchange

of Utah school trust lands evenly distributed within the borders of Grand Staircase.  *See* Utah

Schools and Lands Exchange Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998).  The

broad purpose of this act was to eliminate state inholdings on federal lands within the

Monument's boundaries and to "resolve many longstanding environmental conflicts."  *Id.* §

2(14).  As part of this, the state exchanged "approximately 176,698.63 acres of land and the

mineral interest in approximately an additional 24,000 acres" that were "within the exterior

boundaries of the Monument" for federal land outside the Monument boundaries.  Agreement to

Exchange Utah School Trust Lands between the State of Utah and the United States of America

§ 2.  The agreement specifically stated that any lands acquired by the United States "within the

exterior boundaries of the Monument . . . shall become a part of the Grand Staircase-Escalante

National Monument, and shall be subject to all the laws and regulations applicable to the

Monument."  *Id.* § 5.  The same legislation provided Utah with an additional $50 million in

compensation.  *See* Utah Schools and Lands Exchange Act § 7.

65.     As of April 2017, the former federal lands Utah received in exchange for

transferring the inholdings to the federal government have, upon information and belief,

generated over $340 million in revenue for Utah, including from oil, gas, and coal leases and

royalties.  *See* Jennifer Yachnin, *Utah Land Swaps Could Foil a Trump Bid to Strip Protection*,

E&E News (May 2, 2017), https://www.eenews.net/greenwire/stories/1060053899/.

66.     In 1998, Congress made additional boundary adjustments to Grand Staircase by

removing land from the Monument in certain areas and adding it in others.  The statute explicitly

references "[t]he boundaries of the Grand Staircase-Escalante National Monument."  Act of

November 6, 1998, Pub. L. No. 105-355, §§ 201–202, 112 Stat. 3247, 3252–53.

67.     In 2009, Congress made further boundary adjustments by removing a parcel of

land from Grand Staircase and conveying it to a private entity.  The legislation states that the

"boundaries of the Grand Staircase-Escalante National Monument in the State of Utah are hereby

modified to exclude the Federal land" conveyed to that private entity.  These changes were

signed into law by the President.  *See* Omnibus Public Land Management Act, Pub. L. No. 111-

11, § 2604, 123 Stat. 991, 1119–18 (2009).

68.     In 2009, Congress also permanently established the National Landscape

Conservation System.  The legislation included Grand Staircase with its then-existing boundaries

in the NLCS:  "[t]he system shall include each of the following areas administered by the Bureau

of Land Management: [] Each area that is designated as [] a national monument[.]"  Pub. L. No.

111-11, § 2002, 123 Stat. at 1095–96.

*Pre-Monument Management of Grand Staircase-Escalante's Public Lands*

69.     Prior to 1996, the federal lands within Grand Staircase-Escalante National

Monument were managed by BLM in accordance with FLPMA's "multiple use" mandate, which

requires managing the land for a range of uses—including oil and gas drilling, mining, and off-

road vehicle use—and does not give primacy to the protection of sensitive resources.  *See* 43

U.S.C. §§ 1702, 1712 (implementing multiple use in the development and revision of land use plans).

70.     Accordingly, BLM managed the Grand Staircase area pursuant to four separate Management Framework Plans, which emphasized intensive resource development activities, such as extraction.  This approach to land management, rooted in "multiple use" principles, did not safeguard the unique area of Grand Staircase in a fashion adequate to the scientific and research opportunities that the Monument protects and enables.

71.     Prior to the designation of Grand Staircase, location, leasing, and exploration of federal lands for mining and other extractive activities threatened the sensitive resources of the Grand Staircase area.  For example:

  a.   Coal had been mined in the Monument area since the late 1800s.  Starting in the 1960s, larger extractive ventures took an interest in coal mining.  These ventures acquired leases and drilled test holes.  In the 1980s, Andalex Resources began the process of developing an underground mine to ship coal from their lease on the Kaiparowits Plateau.  *See* M. Lee Allison, Utah Geological Survey, *A Preliminary Assessment of Energy and Mineral Resources within the Grand Staircase-Escalante National Monument* 8–9, Utah Dep't of Nat. Res. (1997), http://files.geology.utah.gov/online/c/c-93/index.htm (last visited December 2, 2017).

  b.   Oil and gas drilling had occurred within the Grand Staircase area since 1921.  *See id.* at 22–23.  Indeed, immediately prior to the Monument creation, oil and gas companies attempted to lease large acreages for

development.  *See id.* at 13–14 ("Industry representatives reported

attempts to lease an additional 60,000 acres of BLM lands by oil and gas

companies in 1996, were denied by BLM.").

   c.  Prospectors had also pursued other minerals, such as uranium, titanium,

manganese, gold, copper, and lead.  *See id.* at 27–32.

*Management of the Grand Staircase-Escalante National Monument*

72.    Grand Staircase was the first national monument over which BLM was given

management authority.  The 1996 Proclamation requires BLM to manage the Monument "to

implement the purposes of this proclamation."  1996 Proclamation, 110 Stat. at 4564.

73.    In November 1999, pursuant to the 1996 Proclamation and BLM's obligations

under 43 U.S.C. § 1712(a) to "develop, maintain, and, when appropriate, revise land use plans,"

BLM issued the Grand Staircase Management Plan, which provided detailed guidelines for

managing the Monument in accordance with the 1996 Proclamation (as opposed to general

multiple use principles).  *See generally* Grand Staircase Management Plan.

74.    The Grand Staircase Management Plan was created after extensive public

engagement, including, for example, over two dozen public scoping workshops and open houses

in cities and towns across the country, including Kanab, Utah; Escalante, Utah; Denver,

Colorado; Washington, DC; San Francisco, California; Flagstaff, Arizona; and Albuquerque,

New Mexico, in which the public provided input about the draft management plan.  *See* Bureau

of Land Mgmt., U.S. Dep't of the Interior, Grand Staircase Escalante National Monument:

Proposed Management Plan, Final Environmental Impact Statement 4.1–4.3 (1999); Bureau of

Land Mgmt., U.S. Dep't of the Interior, Grand Staircase Escalante National Monument: Draft

Management Plan, Draft Environmental Impact Statement 5.1–5.2 (1998).

75.     The Grand Staircase Management Plan adopted two basic precepts: (i) the
Monument must be protected in its primitive frontier state in order to safeguard the sensitive
scientific and historic resources, and (ii) the Monument should continue to provide unparalleled
opportunities for the scientific study of those resources.  *See* Grand Staircase Management Plan
at iv, 5.  BLM concluded that significant development will undermine and destroy the very
qualities of the Monument that preserve these sensitive resources and create the scientific
opportunities for which the Monument was created and is best known.

*Scientific Research and Discoveries within Grand Staircase-Escalante National Monument*

76.     The Monument remains a wellspring of significant scientific research, which
would be drastically undermined by the elimination of extensive Monument protections.
Scientists flock to Grand Staircase because it is a landscape protected for its scientific values.  In
2014, for example, the last year for which public data is available, more than 30 institutions from
four countries conducted research in the Monument, including: Brigham Young University,
University of Nevada-Las Vegas, Chicago Botanic Garden, Desert Botanical Garden, University
of Utah, Northern Arizona University, Nagoya University (Japan), James Cook University
(Australia), National de la Recherche Scientifique (France), University of Nebraska, University
of Pennsylvania, San Diego State University, California State Polytechnic University, Denver
Museum of Nature and Science, Northwestern University, University of Massachusetts-Amherst,
Penn State University, Massachusetts Institute of Technology, University of North Florida, Idaho
State University, Missouri Southern State University, Museum of Northern Arizona, Norbert
College, Weber State University, Midwestern University, Raymond Alf Museum, Colorado
Mesa University, Montana State University, Utah State University, Colorado State University,
and the Academy of Natural Sciences of Philadelphia.  *See* Bureau of Land Mgmt., U.S. Dep't of

the Interior, Grand Staircase-Escalante National Monument Manager's Annual Report FY 2014 at 26–43 (2015).

77.     Researchers have unearthed groundbreaking paleontological discoveries within the Monument, discoveries which continue to be made.  *See* Bureau of Land Mgmt., U.S. Dep't of the Interior, Grand Staircase-Escalante National Monument Manager's Annual Report FY 2014 at 49–50 (2015). For instance:

a. Since 1996, researchers have discovered over 45 new paleontological species—including 12 new species of dinosaurs—and over 300 taxa total within the Kaiparowits Plateau alone.  *See* Jeffrey G. Eaton & Richard L. Cifelli, *Review of Late Cretaceous Mammalian Faunas of the Kaiparowits and Paunsaugunt Plateaus, Southwestern Utah*, *in At the Top of the Grand Staircase: the Late Cretaceous of Southern Utah* 319–28 (Alan L. Titus & Mark A. Loewen, ed. 2013); Alan L. Titus, Jeffrey G. Eaton & Joseph Sertich, *Late Cretaceous Stratigraphy and Vertebrate Faunas of the Markagunt, Paunsaugunt, and Kaiparowits Plateaus, Southern Utah*, 3 Geology of the Intermountain West 229, 229–91 (2016), https://www.utahgeology.org/openjournal/index.php/GIW/article/view/10/10.  According to these experts, only 6 percent of the Kaiparowits Plateau has even been inventoried.  *Id.*

b. All of the Monument has paleontological potential according to BLM's own paleosensitivity map.  The potential ranking has five categories ranging from "low" to "high".  None of the Monument is ranked as "low" and a considerable area of the Kaiparowits Plateau, especially the areas

where the Kaiparowits, Wahweap, and Tropic Shale Formations are

exposed at the surface, ranks as "high."  The amount of bone exposed in

the latter areas exceeds all but the most fossiliferous units anywhere in the

world: "high" is thus exceptionally high.  The areas ranked as "medium"

to "medium-high" include the Moenkopi and Chinle Formations, and can

only be characterized as such in relation to the Kaiparowits Plateau.  Both

of these formations have abundant paleontological sites and are units that

are generally recognized to be highly fossiliferous when considered on

their own merits rather than in comparison with the truly exceptional

Kaiparowits.  Similarly, the "low-medium" areas are only characterized as

such in relation to the Kaiparowits Plateau.  These sites are also

recognized on their own merits as fossiliferous.  A true and correct copy of

this map is attached as Exhibit B.

c.  National Landscape Conservation System funding tied to Monument

status has allowed researchers to make numerous vertebrate, invertebrate,

and paleobotanical discoveries within the Monument.  For example, for

over 16 years, this funding has allowed the Natural History Museum of

Utah, located in Salt Lake City, to inventory 964 paleontological localities

and collect over 2000 fossil specimens on the Kaiparowits Plateau alone.

d.  The sedimentary rocks also offer a remarkable faunal diversity, including

the highest diversity of the iconic frilled herbivorous dinosaurs (known as

ceratopsians) worldwide from a single time period.  *See* Titus, et al.,

*supra*, ¶ 77.a.  Discoveries include the oldest tyrannosaur, the oldest

named ancestor of *Tyrannosaurus rex* (*Lythronax argestes*), and the oldest

named ceratopsian (*Diabloceratops eatoni*), a relative of the

iconic *Triceratops*.  *See* Mark A. Loewen, et al., *Ceratopsid Dinosaurs*

*from the Grand Staircase of Southern Utah*, *in At the Top of the Grand*

*Staircase: the Late Cretaceous of Southern Utah* 488–503 (Alan L. Titus

& Mark A. Loewen, eds. 2013); Mark A. Loewen, et al., *Tyrant Dinosaur*

*Evolution Tracks the Rise and Fall of Late Cretaceous Oceans*, 8 PLoS

One 1 (2013), https://www.researchgate.net/publication/

258504134_Tyrant_Dinosaur_Evolution_Tracks_the_Rise_and_Fall_of_L

ate_Cretaceous_Oceans (last visited Dec. 2, 2017).

e.  Fossil preservation within the Monument is often exceptional, with

dinosaur specimens exhibiting soft tissue preservation of skin, beaks, and

claws.  *See* Titus, et al., *supra*, ¶ 77.a.  For example, as recently as

September 2017, a remarkably well-preserved subadult specimen of

*Teratophoneus currie* was excavated and airlifted out of the Monument for

further study at the Natural History Museum of Utah.  Paleontologists

believe they recovered at least three-quarters of the whole skeleton,

including the skull.  According to Dr. Randall Irmis, who led the

excavation, "these species that we're finding in Grand Staircase-Escalante

National Monument, whether they be dinosaurs or crocodiles or turtles or

mammals, they're only found in this one place. . . .  They're found

nowhere else on Earth."  Meghan Bartels, *Teenage Dinosaur Fossil*

*Discovery Reveals What Puberty Was Like for a Tyrannosaur*, Newsweek

(Oct. 20, 2017), http://www.newsweek.com/teenage-dinosaur-fossil-discovery-reveals-puberty-tyrannosaur-689448 (last visited Dec. 2, 2017).

78.     The protections that flow from the creation of Grand Staircase safeguard sites for future paleontological research, as well.  Without such protections, the paleontological resources would be under threat.  For example, coal mining and shale gas production are major threats to such resources.  The Straight Cliffs Formation, in particular, is one of the most fossiliferous, scientifically important non-marine units of its age to be protected with national monument status.  It is interlayered with the coal beds of the Kaiparowits Plateau and preserves unique fossils from an interval of time that cannot be studied in detail anywhere else in the world.  This formation may, under the December Proclamation, be subject to coal extraction.  Similarly, the Tropic Shale is a scientifically important marine unit of the Kaiparowits Plateau because it preserves evidence for a Cretaceous extinction event driven by low oxygen levels in the Earth's ancient oceans that was associated with an ecological turnover in marine reptiles from an ecosystem dominated by pliosaurs and ichthyosaurs to one dominated by plesiosaurs and mosasaurs.  The Tropic Shale has been identified as having shale gas potential.  *See* Steven Schamel, Utah Dep't of Nat. Res., Shale Gas Resources of Utah: Assessment of Previously Undeveloped Gas Discoveries 499 (2006), http://files.geology.utah.gov/online/ofr/ofr-499.pdf. (last visited Dec. 3, 2017).  Gas drilling and fracking activities would fragment the fossils in the shale and alter its sediments.  On information and belief, these destructive extractive activities are facilitated by the change in monument status.

79.     Grand Staircase continues to maintain a remarkable degree of biological diversity. *See* Bureau of Land Mgmt., U.S. Dep't of the Interior, Grand Staircase-Escalante National Monument Manager's Annual Report FY 2014 at 54–63 (2015).  For example:

a.   The Monument contains a significant percentage of Utah's rare and endemic plant species and a significant percentage of all the plants found in Utah.  *See* Leila M. Shultz, *Patterns of Endemism in the Utah Flora*, *in Proceedings of the Southwestern Rare and Endangered Plant Conference* 249–63 (Robert Sivinski and Karen Lightfoot, eds. 1992), https://www.researchgate.net/publication/264704907_Patterns_of_endemism_in_the_Utah_Flora (last visited Dec. 2, 2017).

b.   More than 650 bee species are now described within Grand Staircase.  *See* Olivia Messinger Carril, *Bee Haven: The Significance of Grand Staircase-Escalante National Monument for Native Bees*, *in Learning from the Land: Science Summary, 2006-2016* at 8 (2016).

c.   The diversity of aquatic invertebrates in the Monument is consistently higher—with up to three times more species—than in other locations.  *See* Mark R. Vinson & Eric C. Dinger, *Aquatic Invertebrates of the Grand Staircase–Escalante National Monument*, *Utah*, 53 Southwestern Naturalist 301, 374–84 (2008), https://www.researchgate.net/publication/232673708_Aquatic_Invertebrates_Of_the_Grand_Staircase-Escalante_National_Monument_Utah (last visited Dec. 2, 2017).

80.   On information and belief, extensive elimination of the Monument's protections will inevitably lead to habitat changes that will permanently harm this diversity.

81.   The Monument continues to be a rich source of historic and archaeological discovery, too.  *See* Bureau of Land Mgmt., U.S. Dep't of the Interior, Grand Staircase-Escalante National Monument Manager's Annual Report FY 2014 at 51–54 (2015).  For instance:

a.  A Paleoarchaic site in the Monument has provided researchers with
    evidence of a wild ancestor of the turkey, which may have been the source
    of turkeys used during the Ancestral Puebloan era.  This discovery has
    contributed to an enhanced understanding of cultural migration and trade
    patterns.  *See* Bradley A. Newbold, et al., *Early Holocene Turkey*
    (Meleagris gallopavo) *Remains from Southern Utah: Implications for the*
    *Origins of the Puebloan Domestic Turkey*, *in Learning from the land:*
    *Science Summary, 2006-2016* at 4 (2016).

b.  Research is being conducted in the Monument on unusual features known
    as "cup and channel" petroglyphs—geometric carvings that often involve
    a long, straight channel ending in a small, shallow basin.  These unique
    petroglyphs are exceptionally large (in some cases up to two meters long),
    and can be found at prominent locations.  It has been theorized that they
    were used to indicate important places, but their definitive function
    remains undetermined.  *See* Michael L. Terlep, *Water, Pitch, and*
    *Prehistoric Indexes: An Analysis of Cup and Channel Petroglyphs*, *in*
    *Learning from the land: Science Summary, 2006-2016* at 5 (2016).

c.  Archaeologists in the Grand Staircase have also reconstructed climate,
    fire, and vegetation patterns spanning back 7,300 years for Fiftymile
    Mountain and nearly 1,650 years for Johnson Canyon.  *See* Robert M.
    D'Andrea, et al., *Paleoecology of Grand Staircase-Escalante National*
    *Monument: Human Landscape Impacts and Management Implications on*

*the Colorado Plateau*, in *Learning from the Land: Science Summary, 2006-2016* at 1 (2016).

    d.   More broadly, the Monument is well-known as the point of contact for the Fremont and Ancestral Puebloan cultures.  *See, e.g.*, Florence C. Lister, *Kaiparowits Plateau and Glen Canyon Prehistory: An Interpretation Based on Ceramics*, 71 U. Utah Anthropological Papers iii, iii–92 (1964). Researchers have used ceramics, site plans, and architecture found within the Monument to understand migration and interaction patterns between these cultures.  *See* Joel C. Janetski, Lane D. Richens & Richard K. Talbot, *Fremont-Anasazi Boundary Maintenance and Permeability in the Escalante Drainage*, in *Learning from the Land: Science Summary, 2006-2016* at 2 (2016).

    e.   Site density analyses of archaeological inventory projects within the Monument indicate that over 100,000 archaeological sites may lie within Grand Staircase's boundaries.  *See* David B. Madsen, Utah Geological Survey, *A Preliminary Assessment of Archaeological Resources within the Grand Staircase-Escalante National Monument, Utah* 5, Utah Dep't of Nat. Res. (1997), https://ugspub.nr.utah.gov/publications/circular/C-95.pdf (last visited Dec. 3, 2017).

    82.   On information and belief, extensive elimination of the Monument's protections endangers both the resources underlying many of these discoveries—by weakening protections against vandalism and looting, for example—and the process of discovery itself by permanently undermining the opportunities for scientific research.

83.     The Monument also continues to preserve historical resources from more recent eras.  Historic resources associated with the Paiute, Ute, Hopi, Zuni, and Navajo are contained within Grand Staircase's boundaries.  Further, resources from an important era of Mormon history are protected, including the famous Hole-in-the-Rock trail.  On information and belief, the elimination of the Monument's protections will threaten many of these more recent historical resources.

*Grand Staircase-Escalante National Monument and the Surrounding Communities*

84.     Designation and reservation of Grand Staircase-Escalante National Monument has been a boon to the local communities and economies.  BLM purposefully located major visitor centers and other visitor opportunities in nearby towns instead of within the Monument itself, which had the intended effect of ensuring that the economic development generated by the Monument was situated in the surrounding communities.  *See* Grand Staircase Management Plan at iv.  Surrounding communities such as Kanab, Escalante, and Boulder have seen a proliferation of small businesses, and there are now over 100 outfitters and guides with business operations tied to the Monument.  Moreover, total employment in the Monument region has grown since Grand Staircase's creation: the population has grown by 13 percent between 2001 and 2015 and jobs have grown by 24 percent.  *See* Headwaters Economics, *The Economic Importance of National Monuments to Local Communities: Grand Staircase-Escalante National Monument Fact Sheet* 1 (2017).  The elimination of Grand Staircase's protections threatens these gains.

85.     This same pattern of economic dynamism is seen at the county level, too, with surrounding Kane and Garfield Counties experiencing continuous and sizeable economic benefits, including economic diversification, greater employment opportunities, and improved

per capita income.  *See id.* at 1–2.  Extensive elimination of Grand Staircase's protections threatens these gains.

86.     Prior to the Monument's creation, employment had begun to shift away from traditional commodity-based industries and toward more sustainable service-based industries. This trend has continued.  Professional services jobs (*e.g.*, doctors and engineers) have grown 42 percent from 2001 to 2015 and comprise much of the employment growth in the Monument region.  *See* Headwaters Economics, *The Economic Importance of National Monuments to Local Communities: Grand Staircase-Escalante National Monument Fact Sheet* 1 (2017).  This growth has not come at the expense of traditional jobs in areas such as agriculture, mining, and timber: "[l]ong before the monument's creation, commodity industries . . . were becoming a smaller share of the overall economy in the Grand Staircase-Escalante Region.  These industries remain part of the region's economy today."  *Id*.  The elimination of Grand Staircase's protections threatens this more robust economic structure.

87.     As expected, this robust job growth and economic development has positively impacted personal income.  *See id.* at 1.  Garfield County experienced average annual real per capita personal income growth that outperformed Utah's average throughout the 2000s and between 2010 and 2015.  *See* Pacific Northwest Regional Economic Analysis Project, *Garfield County vs. Utah Comparative Trend Analysis: Per Capita Personal Income Growth and Change, 1969-2015*, https://utah.reaproject.org/analysis/comparative-trends-analysis/per_capita_personal_income/tools/490017/490000/.  The extensive elimination of Grand Staircase's protections threatens these gains.

88.     Aside from direct economic benefits, the communities have also benefitted from having a more direct and concrete role in advising BLM on land management decisions within

the Monument.  Under the Grand Staircase Management Plan, the Secretary of the Interior

established a Monument Advisory Committee.  *See* Grand Staircase Management Plan at 66.

This committee was comprised of members with expertise in archaeology, paleontology,

geology, botany, wildlife biology, history, social science, and systems ecology.  Members also

included an elected official from Garfield County, an elected official from Kane County, a state

or tribal government representative, an educator, a representative of the environmental

community, an outfitter and guide that operates within Grand Staircase, and a livestock grazing

permittee operating within the Monument.  The Committee met quarterly to solicit input on

management decisions.  Robust community input was thus institutionally woven into the

Monument's management.  Defendant Zinke suspended the Monument Advisory Committee in

May 2017.

89.     Grand Staircase has also been woven into the region's cultural experience and

opportunities, as evidenced by the numerous festivals celebrating the community connections to

the Monument, including the Boulder Heritage Festival, the Escalante Canyons Arts Festival,

and the Amazing Earthfest in Kanab.  The extensive elimination of Grand Staircase's protections

will weaken and undermine these cultural community offerings.

90.     Additionally, Grand Staircase provides important educational opportunities.

Indeed, one of Grand Staircase Escalante Partners's key roles is connecting the community with

groundbreaking science and discoveries coming out of the Monument.  K-12 students across the

gateway communities of Grand Staircase have the opportunity to experience directly the science

and cultural significance of the region as an integrated component of their education.  *See* Bureau

of Land Mgmt., U.S. Dep't of the Interior, Grand Staircase-Escalante National Monument

Manager's Annual Report FY 2014 at 15–21 (2015).  The extensive elimination of Grand

Staircase's protections will substantially undermine these educational opportunities.

*The 2017 Monument Review*

91.     On February 22, 2017, Senator Orrin Hatch (R-UT) announced that he discussed

rescinding or reducing Grand Staircase with Defendant Trump in order to facilitate industrial

development of the coal reserves underlying the Kaiparowits Plateau in the Grand Staircase.  He

stated that "[President Trump] would be able legally to create the access to this great treasure

that may save Utah and the country someday" by eliminating Grand Staircase's  protections.

Lisa Riley Roche, *Hatch Tells State Lawmakers Trump Looking at Bears Ears, Grand Staircase*,

Deseret News (Feb. 22, 2017, 2:46 PM), http://www.deseretnews.com/article/865673984/Hatch-

tells-state-lawmakers-Trump-looking-at-Bears-Ears-Grand-Staircase.html (last visited Dec. 2,

2017).

92.     On April 26, 2017, Defendant Trump signed Executive Order 13792, mandating

that Defendant Zinke review "all Presidential designations or expansions of designations under

the Antiquities Act made since January 1, 1996, where the designation covers more than 100,000

acres, where the designation after expansion covers more than 100,000 acres, or where the

Secretary determines that the designation or expansion was made without adequate public

outreach and coordination with relevant stakeholders."  82 Fed. Reg. 20,429, 20,429 (May 1,

2017).  After a 120-day review timeframe, Secretary Zinke was to recommend "Presidential

actions, legislative proposals, or other actions consistent with law as the Secretary may consider

appropriate to carry out the policy" in the order.  *Id.* at 20,430.

93.     The date range for the Monument Review indicates that the review was

specifically structured to include Grand Staircase, which was created in 1996.  *See* Amy Joi

O'Donoghue, *Interior Secretary Zinke: Bears Ears at Center of National Monument Review*,

Deseret News (Apr. 25, 2017, 7:10 PM),

http://www.deseretnews.com/article/865678594/Interior-Secretary-Zinke-Bears-Ears-at-center-

of-national-monument-review.html (describing Grand Staircase as one "bookend" of the review).

The review also focused on Bears Ears National Monument in Utah, which was created in 2016,

and several other national monuments.  For the avoidance of any doubt, Bears Ears National

Monument is entirely separate from Grand Staircase and this complaint is focused only on

actions affecting Grand Staircase.

94.     On May 10, 2017, Defendant Zinke arrived at Grand Staircase as part of the

Monument review process.  During the day, he toured a small portion of the Monument on foot

with Michael Noel, a Utah state representative who had introduced a resolution in the Utah

House of Representatives calling for Congress to drastically reduce Grand Staircase.  *See* H.C.R.

12, 2017 Leg., Gen. Sess. (Utah 2017).  Defendant Zinke also took a two-hour helicopter tour of

the Monument area prior to departing.  *See* Tracie Sullivan, *On the Ground with Zinke: Grand

Staircase Trip Brings 'Optimism'*, St. George News (May 11, 2017),

https://www.stgeorgeutah.com/news/archive/2017/05/11/tds-on-the-ground-with-zinke-grand-

staircase-trip-brings-optimism (last visited Dec. 2, 2017).  Defendant Zinke refused to meet with

representatives of Plaintiffs Grand Staircase Escalante Partners or Conservation Lands

Foundation during his visit to Utah, and Defendant Zinke also refused to meet with

representatives of numerous local businesses, including the Escalante-Boulder Chamber of

Commerce.  During the same visit, Defendant Zinke stated that Defendant Trump wishes to

develop "all energy sources" and that "energy has to be abundant, reliable and affordable and

coal has taken huge hits and the [P]resident and I believe inappropriately so."  *Id.*

95.     On May 25, 2017, Plaintiff Society of Vertebrate Paleontology submitted comments to the Department of the Interior as part of the review process expressing support for Grand Staircase and strongly opposing any changes to the Monument's boundaries or management.  The comments detailed the critical role that Grand Staircase plays in paleontological research and the importance of maintaining Grand Staircase's boundaries for that research.  *See* Comments of the Society of Vertebrate Paleontology, DOI-2017-0002-100908 (filed May 25, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-100908 (follow Attachment "PDF" hyperlink at bottom of page) (last visited Dec. 2, 2017).

96.     On May 27, 2017, Plaintiff Conservation Lands Foundation submitted comments to the Department of the Interior as part of the review process supporting Grand Staircase and strongly opposing any changes to the Monument's boundaries or management.  *See* Comments of the Conservation Lands Foundation and the Wilderness Society, DOI-2017-0002-112216 (filed May 26, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-112216 (follow Attachment "PDF" hyperlink at bottom of page) (last visited Dec. 2, 2017).

97.     On July 07, 2017, Plaintiff Grand Staircase Escalante Partners submitted extensive comments to the Department of the Interior as part of the review process: supporting Grand Staircase; demonstrating the continuing need for protection of its paleontological, archaeological, historic, and geologic resources; enumerating its ongoing benefits for the surrounding communities; and strongly opposing any changes to the Monument's status, boundaries, or management.  *See* Comments of Grand Staircase Escalante Partners, DOI-2017-0002-574082 (filed Jul. 7, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-574082 (follow Attachment "PDF" hyperlink at bottom of page) (last visited Dec. 2, 2017).

Case 1:17-cv-02591-EGS   Document 1   Filed 12/04/17   Page 44 of 56

98.     On July 10, 2017, the review comment period closed.  Regulations.gov reflects

2,836,268 individual comments in this proceeding.  Studies of these comments reveal

overwhelming support for maintaining monument protections.  *See* Aaron Weiss, *America to*

*Trump and Zinke: Don't Touch National Monuments*, Westwise: Center For Western Priorities

Blog (Jul. 10, 2017), https://medium.com/westwise/america-to-trump-and-zinke-dont-touch-

national-monuments-8f4b40c43599 (finding that 98 percent of submissions "express support for

keeping or expanding national monument designations" with 1 percent neutral and 88 percent

support for monuments from Utah submissions) (last visited Dec. 2, 2017).

99.     On August 24, 2017, Defendant Zinke sent a report with his national monument

recommendations to Defendant Trump.  The report was not made public.  Instead, the

Department of the Interior released a one-and-a-half page summary that contained no details.

The Washington Post later reported that Defendant Zinke had recommended the elimination of

protections for Grand Staircase.  *See* Juliet Eilperin & Darryl Fears, *Interior Secretary*

*Recommends Trump Alter at Least Three National Monuments, Including Bears Ears*, The

Washington Post (Aug. 24, 2017), https://www.washingtonpost.com/news/energy-

environment/wp/2017/08/24/interior-secretary-recommends-trump-alter-a-handful-of-national-

monuments-but-declines-to-reveal-which-ones/?utm_term=.50aa41ac9bfb (last visited Dec. 2,

2017).

100.     On September 17, 2017, the Washington Post obtained and made public

Defendant Zinke's national monuments recommendations.  *See* Juliet Eilperin, *Shrink At Least 4*

*National Monuments and Modify a Half-Dozen Others, Zinke Tells Trump*, The Washington Post

(Sept. 17, 2017), https://www.washingtonpost.com/national/health-science/shrink-at-least-4-

national-monuments-and-modify-a-half-dozen-others-zinke-tells-trump/2017/09/17/a0df45cc-

- 44 -

9b48-11e7-82e4-f1076f6d6152_story.html?utm_term=.db9a4c243bd8 (last visited Sept. 17,

2017).  The recommendations noted the large deposits of coal and oil resources underlying

Grand Staircase and recommended that "[t]he Proclamation should be amended, through the use

of appropriate authority, including lawful exercise of the President's discretion granted by the

[Antiquities] Act, to protect objects and prioritize public access; infrastructure upgrades, repair,

and maintenance; traditional use; tribal cultural use; and hunting and fishing rights."  Defendant

Zinke also recommended that "[t]he boundary should be revised through the use of appropriate

authority, including lawful exercise of the President's discretion granted by the [Antiquities]

Act."  Finally, Defendant Zinke recommended that "[t]he management plan should be revised to

continue to protect and prioritize public access; infrastructure upgrades, repair, and maintenance;

traditional use; tribal cultural use; and hunting and fishing rights" and that "[t]he DOI should

work with Congress to secure funding for adequate infrastructure and management needs to

protect object efficiently."  The report contained no rationale for these recommendations, made

no detailed recommendations, and wholly lacked substantive discussion of the sensitive

resources that the Monument was created to protect.

     101.    On October 27, 2017, Defendant Trump announced to Senator Orrin Hatch that he

was "**approving the Bears Ears and Grand Staircase recommendation for you, Orrin.**"

Jennifer Yachnin, *Trump to Slash Bears Ears, Grand Staircase—Hatch*, E&E News (Oct. 27,

2017), https://www.eenews.net/eenewspm/stories/1060064939/ (emphasis added) (last visited

Dec. 2, 2017).  For his part, Senator Hatch announced that Defendant Trump "would modify the

Grand Staircase to allow coal mining in the Kaiparowits Plateau."  Thomas Burr & Brian Maffly,

*Trump Headed to Utah in December with Plans to Shrink Bears Ears and Grand Staircase*, The

Salt Lake Tribune (Oct. 27, 2017), http://www.sltrib.com/news/politics/2017/10/27/trump-tells-sen-orrin-hatch-hell-shrink-the-bears-ears-national-monument/ (last visited Dec. 2, 2017).

*Lands and Sensitive Resources Removed from the Monument by the December Proclamation*

102.    On information and belief, Defendant Trump's December Proclamation, *see supra*, ¶¶ 11–13, excludes more than 65,000 acres that were specifically added to the Monument by Congress when it ratified the land exchange agreement between Utah and the Federal Government.  *See* Utah Schools and Lands Exchange Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998).

103.    The areas eliminated from the Monument by the December Proclamation contain numerous sensitive resources, including objects specifically identified in the 1996 Proclamation. Geological formations such as the Waterpocket Fold, portions of the Kaiparowits Plateau, and the Grand Staircase cliff sequence have been removed or fractured.  Historical locations such as archaeological sites in the Circle Cliffs and the Hole-in-the-Rock trail have been excluded and carved up.  Biological resources, such as bear habitat, desert bighorn sheep habitat, and the Paria River wildlife corridor and been split or removed from the Monument.  These objects and lands depend upon Grand Staircase as a cohesive, undeveloped unit for their continued protection.  The December Proclamation upends that cohesion and immediately threatens the continued integrity of these resources and others.

104.    The December Proclamation will have a particularly destructive impact on the Monument's paleontological resources.  On information and belief:

a.    At least 400 scientifically important fossil sites have been excluded by the new monument boundaries.

b.  All of the Monument's oldest fossils that document the largest mass extinction in Earth's history and its subsequent recovery have been excluded.

c.  Much of the petrified forest referred to in the 1996 Proclamation has been excluded.  This is the largest example of petrified forest outside of Arizona.  Trunks of ancient *Araucarioxylon* trees are preserved in a large section of the Circle Cliffs area.  These fossils also contain some of the earliest evidence for insect metamorphosis in which larvae (like grubs and caterpillars) have completely different forms and lifestyles from adults (like bugs and butterflies).

d.  The excluded area south of Escalante (near Camp Flats) includes some of the most important sites in the Wahweap Formation, which was named in the 1996 Proclamation, including the site where the unique horned dinosaur *Machairoceratops* was discovered.  It also includes the place where only known specimen of a new species of nodosaur (a relative of ankylosaurus, the armored dinosaur) was discovered and where there is a major hadrosaur (duck-billed dinosaur) bonebed.

e.  All of the Naturita (Dakota) Formation mammal localities from Bulldog Bench outside of Cannonville have been removed from the Monument. This is the only Cenomanian nonmarine vertebrate fauna in the world and has produced many "type" species of mammals, which are the scientific reference standard for future evaluations of those findings.

f.   Outside of Henrieville, the best microvertebrate locality (site with tiny
     fossils that represent small and often rare species) from the Turonian age
     in North America (Smoky Hollow Member of the Straight Cliffs) has been
     eliminated from the Monument.

g.   The Kaibab Limestone geological unit is a widespread and important layer
     in western North America, extending into the Grand Canyon, for example.
     Its "type" area—where the defining characteristics of the bed (its color,
     texture, composition, chemistry, fossil contents, and age) are studied in a
     particular location and then used to trace the bed over sometimes large
     distances—is excluded by the new monument boundaries.

h.   Virtually all of the Tropic Shale—which was specifically named in the
     1996 Proclamation—has been excluded.  The Tropic Shale is one of the
     only fully marine geological units in the Monument—from when this
     region was covered by water eons ago—and is part of the Late Cretaceous
     aged sequence of ecosystems referred to in the 1996 Proclamation.  The
     Tropic Shale captures a critical moment in the transition from
     pliosaur/ichthyosaur dominated oceans from the Early Cretaceous and
     Jurassic to the polycotylid and mosasaur dominated seas of the Late
     Cretaceous.  Loss of the Tropic Shale resource would destroy our ability
     to understand this transition.  Important paleontological resources
     preserved in the Tropic Shale include: evidence for extinction that
     preceded the asteroid impact at end of the Cretaceous that killed the
     dinosaurs; the Earth's earliest mosasaurs, which were giant marine lizards

from the time of the dinosaurs; the very last pliosaur, a giant apex predator

of these ancient seas, named *Brachauchenius*; and missing links in the

origin of polycotylid plesiosaurs, which were long-necked marine reptiles

that became extinct at the end of the Cretaceous period.

105.    On information and belief, the December Proclamation undermines the

protections necessary for preserving both the sensitive resources described above and others.

106.    The December Proclamation disregards overwhelming public and scientific

comments delineating the extensive public benefits that accrue from the protection and

preservation of these resources and public lands.

## CLAIMS FOR RELIEF

## COUNT ONE

*(The President Lacks Constitutional Authority to Eliminate National Monument Protections)*

107.    Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as

though fully set forth herein.

108.    Judicial review is available to ensure that actions of the President are consistent

with the Constitution and to ensure that the President has not usurped Congress' powers.

109.    The U.S. Constitution explicitly grants to Congress plenary and exclusive

authority over federal lands.  *See* U.S. Const. art. IV, § 3, cl. 2.

110.    The U.S. Constitution grants no authority over federal lands to the President.

111.    Through the Antiquities Act, Congress has delegated to the President only the

authority to create national monuments.  The Antiquities Act delegated to the President no

authority to eliminate or otherwise compromise national monument protections in part or in full.

112.     Accordingly, Defendants' attempt to eliminate Grand Staircase-Escalante National Monument's protections is an unconstitutional exercise of legislative authority by the Executive Branch in violation of the Constitution's separation of powers.

113.     Plaintiffs and their members have no adequate remedy at law and absent relief from this Court will suffer irreparable injury flowing from President Trump's unlawful action.

## COUNT TWO

*(The President's Action Is Ultra Vires as the Antiquities Act Does Not Authorize the Elimination of National Monument Protections)*

114.     Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

115.     The Antiquities Act delegates limited authority to the President to declare national monuments and reserve land as part of such monuments.

116.     The Antiquities Act does not explicitly or implicitly grant authority to eliminate national monument protections in part or in full.

117.     The Antiquities Act does not explicitly or implicitly grant authority to the President to subsequently decide that duly protected objects are no longer worthy of protection.

118.     Congress has never amended the Antiquities Act to grant the President such additional authority over national monuments, despite attempts to do so.

119.     Congress has amended the Antiquities Act only to further *restrict* Presidential authority regarding the creation of national monuments.

120.     Congress has repeatedly demonstrated that it retains the sole power to eliminate national monument protections.

121.     Accordingly, Defendants' attempt to eliminate Grand Staircase-Escalante National Monument's protections is not authorized by the Antiquities Act and is *ultra vires*.

122.     Plaintiffs and their members have no adequate remedy at law and absent relief from this Court will suffer irreparable injury flowing from Defendant Trump's unlawful action.

## COUNT THREE

*(The President's Action Is Unconstitutional and Ultra Vires as Congress Has Asserted Its Sole Prerogative over Grand Staircase-Escalante National Monument)*

123.     Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

124.     The President has no authority to alter reservations or withdrawals of federal lands specifically enacted by Congress.

125.     Congress has asserted its sole prerogative over the Monument by legislatively recognizing the protections and full boundaries of Grand Staircase-Escalante National Monument after its creation, ratifying its existence and dimensions.

126.     Congress has asserted its sole prerogative over the Monument by repeatedly adjusting the boundaries of Grand Staircase-Escalante National Monument through legislative enactments.

127.     Congress has asserted its sole prerogative over the Monument by adding land to and removing land from Grand Staircase-Escalante National Monument, legislatively establishing its boundaries.

128.     Congress has asserted its sole prerogative over the Monument by permanently establishing the National Landscape Conservation System and the units that System is composed of, which includes Grand Staircase-Escalante National Monument.

129.     Defendants' attempt to eliminate Grand Staircase-Escalante National Monument's protections encroaches on this Congressional prerogative and is unconstitutional, *ultra vires*, and without legal effect.

130.   Plaintiffs and their members have no adequate remedy at law and absent relief from this Court will suffer irreparable injury flowing from President Trump's unlawful action.

## COUNT FOUR

*(Alternatively, the Elimination of Grand Staircase-Escalante National Monument's Protections Has No Factual or Legal Basis and is Ultra Vires on These Grounds)*

131.   Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

132.   Even if the Court were to find that the President has some authority to eliminate national monument protections, the Antiquities Act does not grant the President *carte blanche* authority to overturn properly promulgated Monument proclamations.

133.   While the President has significant discretion in how designations occur under the Antiquities Act, that discretion is not boundless.  In order to overturn a properly promulgated and judicially sanctioned prior proclamation and for such action to remain within the bounds of the Antiquities Act's delegation, the President needs a clear basis for overcoming the prior Presidential determination.  Moreover, the President is not authorized to import non-statutory standards into the Antiquities Act to determine when "objects" are no longer worthy of protection.

134.   When Grand Staircase-Escalante National Monument was established in 1996, the Monument protected numerous sensitive resources, including a plethora of geological, archaeological, paleontological, historical, prehistorical, and biological objects.  The Monument has been widely regarded as the "Science Monument."

135.   Because the resources protected by the establishment of the Monument are not concentrated in a single area of the Monument, but rather distributed throughout the entire area

of the Monument, they are dependent upon its undeveloped state as a key element for their continued protection.

136.    Since the 1996 establishment, new sensitive resources have been discovered throughout the Monument and surveys indicate that many more sensitive resources await discovery, further demonstrating the world-class nature of the resources at the Monument.

137.    The December Proclamation eliminates monument protections for myriad sensitive resources identified as worthy of protection by the 1996 Proclamation.  The Proclamation fails to articulate the clear, legal basis for undoing the 1996 Proclamation and eliminating these protections.

138.    Accordingly, Defendants' grounds for eliminating protections from Grand Staircase-Escalante National Monument and its sensitive resources are without basis in law or fact and thus *ultra vires*.

139.    Plaintiffs and their members have no adequate remedy at law and absent relief from this Court will suffer irreparable injury from Defendants' actions.

## COUNT FIVE

*(Defendant Zinke Is Obligated to Manage Grand Staircase-Escalante National Monument Consistent with the Superstructure Created by Federal Lands Management Laws, Including the Grand Staircase Management Plan)*

140.    Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

141.    The Administrative Procedure Act creates a right of action for any person adversely affected by final agency action or failure to act, and waives the federal government's sovereign immunity. 5 U.S.C. § 706(2).

142.     The Grand Staircase Management Plan, Federal Land Management and Policy Act, and National Environmental Policy Act, *inter alia*, constitute a superstructure of federal law that impose bounds on the Secretary of the Interior, through the Bureau of Land Management, in actions affecting Grand Staircase-Escalante National Monument.

143.     The laws referred to at ¶ 158, *supra*, also specify procedures that a federal official must follow in order to modify any of Grand Staircase's protections through changes to its management plan or structure.

144.     Eliminating national monument protections from land and resources will result in immediate changes to the management of those lands and resources.

145.     By shrinking Grand Staircase's boundaries, Defendant Trump and Defendant Zinke attempt to change by fiat the management regime applicable to hundreds of thousands of acres of land and the innumerable resources contained thereon.

146.     Additionally, Defendant Trump and Defendant Zinke attempt to change the management regime applicable to the diminished monument by allowing for increased access by vehicles and more intensive vegetation management practices.

147.     Accordingly, Defendant Trump and Defendant Zinke are not authorized to circumvent the laws Congress has passed governing the management of federal lands. Defendants remain obligated to manage the lands comprising Grand Staircase according to the terms of the approved Grand Staircase Management Plan and to follow the procedures specified in FLPMA and NEPA if they wish to undertake modifications to the management regime governing the lands and resources comprising Grand Staircase-Escalante National Monument.

148.     Plaintiffs and their members have no adequate remedy at law and absent relief from this Court will suffer irreparable injury from Defendants actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Grand Staircase Escalante Partners, Society of Vertebrate Paleontology, and Conservation Lands Foundation respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants, as follows:

A.  A declaration that:

   i. the December Proclamation is not authorized by Article II of the U.S. Constitution and is an impermissible violation of the separation of powers;

   ii. the December Proclamation exceeds his delegated power under the Antiquities Act and is *ultra vires*;

   iii. the December Proclamation  exceeds his delegated power under the post-proclamation assertions of Congress' sole prerogative over the Monument and is *ultra vires*;

   iv. The 1996 Proclamation remains operative with regard to the objects identified in that Proclamation and lands within the original boundaries of Grand Staircase-Escalante National Monument, as modified by Congress; and

   v. Secretary Zinke is obligated to manage Grand Staircase-Escalante National Monument pursuant to terms of the 1996 Proclamation.

B.  An injunction:

   i. barring President Trump and Secretary Zinke from recognizing, enforcing or otherwise carrying out the December Proclamation;

   ii. requiring President Trump to recognize that the 1996 Proclamation remains operative;

           iii. barring Secretary Zinke from issuing any regulations or other

               administrative orders pursuant to the December Proclamation; and

           iv. requiring Secretary Zinke to comply with the provisions of the 1996

               Proclamation.

C.  An award of attorney's fees, expenses, and costs; and

D.  Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,


/s/ Gary S. Guzy
Gary S. Guzy (375977)
Herbert Lawrence Fenster (153825)
Garett Robert Rose (1023909)
Shruti Chaganti Barker (1035210)
December 04, 2017      COVINGTON & BURLING LLP
One City Center
850 Tenth Street, N.W.
Washington, DC 20001
Tel: 202-662-5381
Fax: 202-778-5381
gguzy@cov.com
hfenster@cov.com
grose@cov.com
sbarker@cov.com
*Attorneys for Plaintiffs Grand Staircase Escalante Partners, Society of Vertebrate Paleontology, and Conservation Lands Foundation*